Opinion issued April
14, 2011



In The

Court of Appeals

For The

First District of Texas

————————————

NO. 01-10-00107-CV

————————————

SHABRAHAM
YAZDANI-BEIOKY, Appellant

V.

TREMONT TOWER CONDOMINIUM ASSOCIATION, INC., Appellee

 



 



 

On Appeal from 113th District Court

Harris
County, Texas



Trial Court Cause No.
2009-39665

 



 

MEMORANDUM
OPINION

          Appellant,
Shabraham Yazdani-Beioky (“Yazdani”), appeals a judgment in favor of appellee,
Tremont Tower Condominium Association, Inc. (the “Association”) on its claim
for breach of contract.  In three issues,
Yazdani contends that he is not liable in tort, he did not breach the contract,
and the evidence was factually insufficient to support the trial court’s award
of damages.  We conclude that the issue
of tortious liability has not been raised, that the trial court properly found
that Yazdani breached the contract, and that the evidence was factually
sufficient to support the trial court’s award of damages.  We affirm.

Background

          In 2009, Yazdani owned
four condominium units located in Tremont Tower.  The Declaration of Condominium for Tremont
Tower (the “Declaration”) governed the relationship between Yazdani and the
Association.  In relevant part, the Declaration
provides:

[E]ach Owner shall . . . pay for damage to the
Condominium caused by the negligence or willful misconduct of . . .
an occupant of the Owner’s Unit, or the . . . occupant’s
. . . guests . . . and for costs incurred by the
Association to obtain compliance, including attorneys’ fees . . . .

 

The
Declaration further provides:

The owner of the unit shall be jointly and severally liable
with the lessee of his unit . . . for any damages to the Condominium
including, without limitation, the common Elements or Building, caused by such
lessee.  Provided, however, that an Owner
shall not be liable for, or responsible for any criminal acts of such lessee.

 

          In
January, George Eric Jauregui signed a 1-year lease agreement with Yazdani to
rent one of his condominium units.  The
agreement lists Jauregui as the sole tenant and occupant; it also provides that
Jauregui may not permit any guest to stay longer than 30 days without Yazdani’s
permission.  In the agreement, Jauregui
designated Frederick Estey as the person whom, in the event of Jauregui’s death,
would have been permitted in Yazdani’s presence to access the condominium unit
for the purpose of removing Jauregui’s personal property.

          In
February, Jauregui and Estey both moved into the condominium unit.  The Association’s on-site manager issued
Jauregui a key fob enabling access to Tremont Tower’s common areas.  At the same time, Jauregui purchased an
additional key fob, which the manager programmed specifically for Estey.  For the next few months, Estey lived in the
condominium unit; the manager and a neighbor who lived across the street often
saw Estey coming and going.

          One
night in mid-May, the neighbor, hearing some commotion across the street,
stepped outside and saw Estey yelling and screaming.  Some unidentified persons expelled Estey from
Tremont Tower.  At the time, Jauregui was
not inside the building.  Estey, who did
not have his key fob, pulled on the door, attempting to reenter.  He then kicked the front glass door,
dislodging, but not breaking, the glass. 
Estey waited for another person to enter through the door whom he
followed inside before the door re-locked itself.  Estey approached the elevator but was unable
to proceed farther.  For the next three
or four minutes, Estey picked up and threw furniture in the lobby.  During Estey’s rampage, a credenza became
scratched, and its brace broke.  A large
vase and a glass lamp broke.  The glass
of an end table shattered, and its legs broke off.  The fabric of one of two matching chairs was
cut with glass.  The wires supporting the
chandelier were broken, and the elevator became scratched and dented.

          Estey
exited the lobby and approached the parking lot.  Estey kicked the metal gate to the parking
lot, dislodging it from its track.  Once
inside, Estey picked up and threw trashcans, triggered some car alarms, and
caused damage to a car.  Estey was hiding
when the police arrived.  The neighbor
and others saw Estey fleeing the scene, and they alerted the police, who chased
down and apprehended Estey.  Estey was
later charged with criminal mischief for intentionally and knowingly causing
the property damage.

          In June, the trial court granted a
temporary restraining order against Yazdani, Jauregui, and Estey, prohibiting
Estey from being at Tremont Tower.  Two
days later, the building manager called Yazdani to inform him that Estey was
still living with Jauregui in Yazdani’s condominium unit.  Yazdani said that he would ensure Estey moved
out.

          The
Association sued Estey for trespass and property damage.  It also sued Jauregui for property
damage.  It sued Yazdani for breach of
contract, contending that he had breached his contractual obligation to pay for
damages done by Estey, who the Association asserted was a guest of Jauregui,
the occupant of Yazdani’s unit.  The
Association also requested attorney’s fees, which it asserted it was owed
pursuant to the Declaration. 

          Neither
Estey nor Jauregui answered or appeared at trial.  Accordingly, the trial court entered a
default judgment against them.  After a
bench trial on the merits of the claim against Yazdani, the trial court
rendered judgment for the Association, awarding $3,380.59 in damages, $45.65 in
prejudgment interest, and $10,120.50 in attorney’s fees.  The court ordered that Estey, Jauregui, and
Yazdani were jointly and severally liable for each amount.

          Yazdani
timely filed a motion for new trial, which was overruled by operation of
law.  Yazdani also timely filed a request
for findings of fact and conclusions of law. 
The trial court did not enter findings of fact or conclusions of law,
but Yazdani failed to file a notice of past-due findings of fact and
conclusions of law before appealing to this Court.

Tortious
Liability

          In his first issue, Yazdani contends
that under Texas tort law, he as a property owner is not liable for the
intentional criminal acts of Estey, who Yazdani claims is a trespasser.  Nevertheless, as Yazdani correctly observes, the
Association
asserted no cause of action against Yazdani other than breach of contract.  There being no cause of action arising in
tort for us to review, we do not reach the merits of Yazdani’s first issue.

The
Declaration

          In his second issue, Yazdani contends
that as a condominium unit owner, he is not contractually liable, under the
Declaration, to the Association for criminal acts of a trespasser.  The essential elements of a breach of
contract claim are:  (1) the existence of
a valid contract; (2) performance or tendered performance by the plaintiff; (3)
breach of contract by the defendant; and (4) damages sustained as a result of
the breach.  Simien v. Unifund CCR Partners, 321 S.W.3d 235, 247 (Tex.
App.—Houston [1st Dist.] 2010, no pet.). 
Challenging only the third element, Yazdani asserts that the
Association failed
to prove that he breached any specific term of the Declaration.  He contends that there is no specific term in
the Declaration referencing a condominium unit owner’s liability for the
criminal acts of a trespasser.  Yazdani
essentially argues that he can be liable for breach of contract only if there
is a contract term specifically referencing an owner’s liability for the damage
caused by criminal acts of trespassers.

          Yazdani provides no argument
supporting such a specificity requirement, either in general or in the
residential-housing situation in particular. 
Yazdani’s only citation to legal authority is Southwell v. Univ. of the Incarnate Word, 974 S.W.2d 351, 354 (Tex.
App.—San Antonio 1998, pet. denied). 
Yazdani cites Southwell to
support the proposition that a plaintiff must prove that the defendant breached
a specific material term of the contract. 
However, Southwell is
inapplicable:  it concerns the term of an
implied contract.  See id. at 356; see also Universal Health Servs., Inc. v. Renaissance
Women’s Group, P.A., 121 S.W.3d 742, 748 (Tex. 2003) (Contracting party can
be liable for breach of implied term if supported by “the presumed intention of
the parties as gathered from the terms as actually expressed in the written instrument
itself [such that implied term] . . . appear[s] . . . so
clearly within the contemplation of the parties that they deemed it unnecessary
to express it.”).

          In contrast, this case does not
involve Yazdani’s breach of an implied term; it involves his breach of an
express term.  The Declaration specifically
provides that “each Owner shall . . . pay for damage to the
Condominium caused by the negligence or willful misconduct of . . .
an occupant of the Owner’s Unit, or the . . . occupant’s
. . . guests . . . .” 
Under this express term, Yazdani agreed to pay for the damages caused by
Jauregui’s guests.  The evidence shows
that both before and after the May 19 incident, Estey was a guest living with
Jauregui in Yazdani’s condominium unit. 
At trial, Kirarash Keyhani, Yazdani’s property manager for the
condominium units he owns at the Tremont Tower, testified that there was no
doubt in his mind that Estey was either a guest or occupant.

          Nevertheless, Yazdani contends on
appeal that for the few hours during the incident Estey ceased to be either an
occupant or guest.  Yazdani contends that
Estey could not have been Jauregui’s guest during the incident because Jauregui
was not present at Tremont Tower that night and because Estey caused the damages after
he had been denied access to Tremont Tower. 
Yazdani points out that the Association also sued Estey, contending that he
was a trespasser during the attack.

          Nevertheless, other evidence supports
the trial court’s finding that Estey remained a guest.  There is no evidence that Jauregui ever
forbade Estey from staying in the condominium unit; to the contrary, the
manager testified that after the incident, Jauregui continued to permit Estey
to live in the unit.  When the
Association’s
manager asked Jauregui if Estey still lived in the condominium unit, Jauregui
replied that he was not going to make Estey leave.  The record is silent as to who excluded
Jauregui from Tremont Tower just prior to the incident and as to why he did not
have in his possession the key fob that had been issued for him by the
manager.  

          Yazdani further observes that the only
Declaration term specifically referencing criminal conduct provides that “an
Owner shall not be liable for, or responsible for any criminal acts of [his]
lessee.”  Yazdani contends that in light
of the express provision that an owner is not liable for the criminal acts of
his lessee, the Declaration does not impose liability for the criminal acts of
trespassers or other third parties. 
However, the provision Yazdani cites is inapplicable.  Specifically, that provision is an exception
to a separate obligation of owners.  In
relevant part, the provision states:

The owner of the unit shall be jointly and severally liable
with the lessee of his unit . . . for any damages to the Condominium
including, without limitation, the common Elements or Building, caused by such
lessee.  Provided, however, that an Owner
shall not be liable for, or responsible for any criminal acts of such lessee.

 

In
context, the exception for damages caused by criminal acts applies only to
criminal acts of a lessee, not those caused by an occupant or an occupant’s
guest.  Yazdani is not being held liable
for the damages caused by his lessee, Jauregui; rather, Yazdani is being held
liable for damages caused by Estey, who was either an occupant or an occupant’s
guest.  We conclude that the trial court
did not err by finding that Estey was either an occupant or a guest and that
Yazdani breached the Declaration’s term making him liable for damages caused by
an occupant or a guest. 

          We overrule Yazdani’s second issue.

Sufficiency of the Evidence

          In his third issue, Yazdani contends
that the evidence is factually insufficient to support the award of damages to
the condominium association.

          A.      Standard of
Review

In an appeal from a bench trial, an
appellate court reviews de novo a trial court’s conclusions of law and will
uphold them on appeal if the judgment can be sustained on any legal theory
supported by the evidence.  BMC Software Belgium v. Marchand, 83
S.W.3d 789, 794 (Tex. 2002); Hailey v. Hailey, 176 S.W.3d 374, 383 (Tex.
App.—Houston [1st Dist.] 2010, no pet.). 
In the absence of findings of fact or conclusions of law, an
appellate court must presume that the trial court made all the findings
necessary to support its judgment.  Boyd v. Boyd, 131 S.W.3d 605, 611 (Tex.
App.—Fort Worth
2004, no pet.) (citing Pharo v. Chambers
County, 922 S.W.2d 945, 948 (Tex. 1996)). 
When the appellate record includes the reporter’s record, the trial
court’s factual findings, whether express or implied, are not conclusive and
may be challenged for legal and factual sufficiency of the evidence supporting
them.  See Middleton v. Kawasaki Steel Corp., 687 S.W.2d 42, 44 (Tex. App.—Houston [14th Dist.]
1985), writ refused n.r.e., 699
S.W.2d 199 (Tex. 1985); Tucker v. Tucker,
908 S.W.2d 530, 532 (Tex. App.—San
Antonio 1995, writ denied).

          To determine whether the evidence was
factually sufficient to support a finding, an appellate court considers and
weighs all evidence that was before the trial court.  Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986); Raymond
v. Raymond, 190 S.W.3d 77, 80 (Tex. App.—Houston [1st Dist.] 2005, no pet.).  When an appellant attacks the factual
sufficiency of an adverse finding on an issue on which he did not have the
burden of proof, the appellant must demonstrate the finding is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and manifestly
unjust.  See Cain, 709 S.W.2d at 176. 
An appellate court must not merely substitute its judgment for that of
the factfinder.  Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex.
2003).  A factfinder has broad discretion
in assessing damages.  Henry v. Masson, No. 01-07-00522-CV,
2010 WL 5395640, at *11 (Tex. App.—Houston [1st Dist.] Dec. 30, 2010, no pet.).

          B.      Analysis

          Under express
terms of the Declaration, Yazdani is contractually liable to “pay for damage to the Condominium[.]”  Although the damages arise in contract, the
parties agree that the proper measure of damages under the Declaration is the
measure of damages applicable in tort law. 


          Generally, the measure of damages to
personal property is “the difference in its market value immediately before and
immediately after the injury, at the place where the damage occurred.”  Thomas
v. Oldham, 895 S.W.2d 352, 359 (Tex. 1995). 
Market value is defined as the amount that a willing buyer who desires
to buy but is under no obligation to buy, would pay to a willing seller who
desires to sell but is under no obligation to sell.  City of
Pearland v. Alexander, 483 S.W.2d 244, 247 (Tex. 1972).  This definition presupposed an existing,
established market.  Wendlandt v. Wendlandt, 596 S.W.2d 323, 325 (Tex. Civ. App.—Houston
[1st Dist.] 1980, no writ).  However, not
all property has a “market value.”  Gulf States Utils. Co. v. Low, 79 S.W.3d
561, 566 (Tex. 2002).  For example, the
Texas Supreme Court has recognized, as a matter of common knowledge, “that used
household goods, clothing and personal effects have no market value in the
ordinary meaning of that term.”  Crisp v. Sec. Nat’l Ins. Co., 369 S.W.2d
326, 328 (Tex. 1963).

          Generally, “[w]hen
market value does not exist, replacement value is the means of assessing
damages.”  Gulf States Utils., 79 S.W.3d at 569.  However, “[i]n some situations, replacement
value does not properly measure damages because it may represent an economic
gain to the plaintiff.”  Id. 
Under this second measure of damages, a plaintiff would receive an
economic gain if, for example, he were awarded the replacement cost for used
household goods, clothing, or personal effects. 
Crisp, 369 S.W.2d at 328.

          When
the replacement cost would represent an economic gain to a plaintiff whose
property has been destroyed, the measure of damages is “the actual worth or
value of the articles to the owner for use in the condition in which they were
at the time of the [incident] excluding any fanciful or sentimental
considerations.”  Id.  Nevertheless, in
determining actual value, a factfinder “may consider original cost and cost of
replacement, the opinions upon value given by qualified witnesses, the gainful
uses to which the property has been put as well as any other facts reasonably
tending to shed light upon the subject.” 
Id. at 329.  In determining damages, the factfinder has
discretion to award damages within the range of evidence presented at
trial.  Gulf States Utils., 79 S.W.3d at 566.

          “Generally,
a property owner is qualified to testify to the value of her property even if
she is not an expert and would not be qualified to testify to the value of
other property.”  Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.,
No. 09-0396, 2011 WL 836860, at *5 (Tex. Mar. 11, 2011); Gulf States Utils., 79 S.W.3d at 566.  An entity’s agent may testify to the value of
the entity’s property if the agent’s position within and duties to the entity
warrant applying a presumption that they are familiar with the entity’s
property and its value.  Reid Rd., 2011 WL 836860, at *6, 8.

          The trial court awarded $3,380.59
in damages.  Of this, $1,070.11
represents amounts the Association spent repairing the chandelier, the front
glass door, the garage gate, and the elevator, and $511.48 represents the
amount spent to obtain a video surveillance tape of the incident.  When
the property is not totally destroyed, a plaintiff may elect to recover the
reasonable cost of repairing the property. 
Pasadena State Bank v. Isaac,
149 Tex. 47, 51, 228 S.W.2d 127, 129 (Tex. 1950).  On appeal, Yazdani
challenges only the remaining $1,799.28, which represents the damage to
property that was not successfully repaired.

          The
Association’s manager testified that following the incident, she “went shopping
and looked at items similar to” the remaining items.  The remaining items had the following
replacement costs at essentially the time of loss:


 
 
 Property
 
 
 Replacement Cost
 
 
 
 
 Credenza
 
 
 $800
 
 
 
 
 Chair
 
 
 $600
 
 
 
 
 End Table
 
 
 $250
 
 
 
 
 Lamp
 
 
 $150
 
 
 
 
 Vase
 
 
 $400
 
 
 
 
 TOTAL
 
 
 $2,200
 
 


 

The manager testified that she had no
knowledge of the items’ original costs and that she was not working for the
Association when the items were purchased. 
She testified that the credenza, chair, and end table were purchased in
2004, but she did not mention when the lamp or vase was purchased.

          In
announcing its judgment, the trial court explained that it was discounting the
replacement costs of the items.  The
trial court explained that it was, however, awarding the Association the full
value for the vase because “vases don’t depreciate.”  Excluding the vase, the items had a total
replacement cost of $1,800, for which the court awarded $1,399.28, reflecting a
discount of $400.72 or 22.26%.

          Yazdani
contends that the evidence is factually insufficient because there was no
testimony of the actual value of the items at the time of the incident.  Yazdani also contends that replacement cost
is irrelevant to the determination of actual value.  We disagree. 
As Yazdani observes, the parties agree that the proper measure of
damages is actual value at the time of the incident.  The Texas Supreme Court has held that a
factfinder may consider replacement cost to determine actual value.  See
Crisp, 369 S.W.2d at 329; cf. Ayala
v. Valderas, No. 01-07-00134-CV, 2008 WL 4661846, at *6 (Tex. App.—Fort
Worth Oct. 28, 2008, no writ) (mem. op.) (replacement cost is factually
insufficient to support damage award based on market value); Hawkins v. Owens, No. 01-99-00918-CV, 2000 WL 1199254, at *4 (Tex.
App.—Houston [1st Dist.] Aug. 24, 2000, pet. denied) (not designated for
publication) (same).  The manager’s testimony regarding the
replacement costs for similar items determined shortly after the incident is some
evidence of the actual value of the items to the Association.  See
Crisp, 369 S.W.2d at 329.

          Yazdani
also contends that the evidence is factually insufficient because there was no
evidence of the amounts of depreciation or the proposition that the vase did
not depreciate.  As noted above, and
contrary to Yazdani’s suggestions, replacement cost is meaningful evidence of
actual value, and the evidence established a total replacement cost of $2,200.  See
Crisp, 369 S.W.2d at 328.  The trial court as factfinder was within its
discretion to award damages within that range. 
See Gulf States Utils., 79 S.W.3d at 566.  We further note that the discounting actually
worked in Yazdani’s favor by reducing the amount of damages.  

          Yazdani
complains that the manager was not the owner of the property.  Although the Association was the owner of the
property, the manager as the Association’s agent could testify to the value of
the property.  See Reid Rd., 2011 WL
836860, at *6, 8.  On appeal, appellant
complains for the first time that there was no evidence offered that she had
the credentials, experience, or expertise to offer testimony on the loss in
value of the items.  However, an owner or
an owner’s agent need not be an expert to testify as to the value of the owner’s
property.  Id.; Gulf States Utils.,
79 S.W.3d at 566.  The manager’s position
and duties show that she was familiar with the Association’s property and its
value.  See Reid Rd., 2011 WL
836860, at *6, 8; Gulf States Utils.,
79 S.W.3d at 566.  We conclude that the
evidence is factually sufficient to support the trial court’s award of damages.

          We
overrule Yazdani’s third issue.

Conclusion

 

We affirm.

 

                                                                   Elsa
Alcala

                                                                   Justice


 

Panel
consists of Chief Justice Radack and Justices Alcala and Bland.